## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge William J. Martínez

Civil Action No. 17-cv-0944-WJM-MDB

XY, LLC;
BECKMAN COULTER, INC.;
INGURAN, LLC d/b/a ST GENETICS,

      Plaintiffs,

v.

TRANS OVA GENETICS, LC,

      Defendant.

---

### ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS'
### MOTION FOR SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT

---

      This matter is before the Court on Plaintiffs XY, LLC ("XY"), Beckman Coulter,

Inc. ("Beckman"), and Inguran, LLC d/b/a ST Genetics' ("Inguran" or "ST") (collectively,

"Plaintiffs") Motion for Summary Judgment of No Inequitable Conduct (the "Motion").

(ECF Nos. 598, 599.)[1]  Defendant Trans Ova Genetics, LC ("TOG") filed a response

(ECF Nos. 611, 613-1), to which Plaintiffs filed a reply (ECF Nos. 623, 625).

      For the reasons explained below, the Motion is granted in part and denied in part.

---

[1] At the outset, the Court observes that, although only the attorneys representing XY and Inguran appear in the attorney signature block, the Motion seeks relief on behalf of "Plaintiffs." (ECF No. 599 at 32.)  On August 26, 2025, the Court advised the parties that it understood the Motion to seek summary judgment in favor of *all* Plaintiffs, including Beckman, and directing any party holding a contrary view to file a notice informing the Court of its position by the following day.  (ECF No. 706.)  To date, the Court has received no such notice.  It thus proceeds with the understanding that the Motion also seeks summary judgment of no inequitable conduct in favor of Beckman.

## I. BACKGROUND[2]

### A.    Filing of the '870 Application

The '559 Patent is based on U.S. Patent Application number 11/632,870 ("the

'870 Application") and claims priority to a provisional patent application filed in July

2004.  (ECF No. 599 at 7 ¶ 1; ECF No. 74-8 (559 Pat.) at 1.)  The invention of the '559

Patent was based on a joint development effort by Kenneth "Mike" Evans at XY and a

number of individuals at DakoCytomation, Beckman's predecessor in interest.  (ECF

No. 599 at 8 ¶ 2.)  Counsel for DakoCytomation filed the '870 Application, therein listing

three DakoCytomation inventors—George Malachowski, Paul Purcell, and Edward

Stanton.  (*Id.* at 8 ¶ 3.)  Evans was not listed as an inventor in the original patent

application.  (*Id.* at 8 ¶ 4.)

### B.    Beckman and XY Negotiate an Agreement

In 2012, XY became aware of the pending '870 Application and informed

Beckman that XY believed Evans should be listed as an inventor.  (*Id.* at 8 ¶ 7.)  Upon

learning of this, Charles Wong—Beckman's in-house assistant general counsel—

conducted a diligent investigation and ultimately concluded that Evans should be added

as an inventor.  (*Id.* at 8–9 ¶ 8.)

Thereafter, Wong and counsel for XY "agreed to put together an agreement

formalizing the roles and responsibilities of what to do with the ['870] application and the

patent that may issue."  (ECF No. 599 at 9 ¶ 10 (quoting ECF No. 599-1 (Wong Dep.) at

---

[2] The Background is derived from the parties' briefs on the Motion and documents submitted in support thereof.  These facts are undisputed unless attributed to a party or source. All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

27:10–18); ECF No. 613-1 at 3 ¶ 10 (admitting "that the parties agreed to discuss a comprehensive agreement").)  The negotiations between Beckman and XY concerned more than just the mechanics of correcting inventorship.  The parties also discussed "issues such as who would own the patent, who would license the patent, how the parties would split up the field of use, copyright issues, prosecution of related foreign applications, and how the costs of prosecution would be split."  (ECF No. 599 at 9 ¶ 12.) Multiple attorneys and businesspeople from both sides were involved in the negotiations, including Beckman's in-house attorneys (Wong and Mike Bell), a flow cytometry business development person for Beckman (Dom Fenoglio), XY's in-house attorneys (Hashim Rahman, Cindee Ewell, Ryan Christensen), and XY's CEO (Juan Moreno).  (*Id.* at 9–10 ¶ 13.)

        Plaintiffs assert that "[b]oth Beckman and XY considered it important to have such an agreement in place prior to undertaking any procedure for correcting inventorship."  (ECF No. 599 at 9 ¶ 11.)  However, TOG disagrees, contending that only Beckman "insisted on the parties executing a comprehensive business agreement before Beckman would take action to correct inventorship," while "XY considered it important to correct inventorship promptly to include [] Evans, even before the parties had an agreement in place."  (ECF No. 613-1 at 3 ¶ 11.)  Indeed, TOG contends that "XY repeatedly asked that Beckman correct inventorship in 2012, but at least before the patent issued."  (*Id.* at 3–4 ¶ 12.)

        While Beckman and XY were still discussing the agreement, the '870 Application issued as U.S. Patent No. 9,134,220 ("the '220 Patent") on September 15, 2015.  (ECF No. 599 at 10 ¶ 14.)  After the '220 Patent issued, outside counsel for both Beckman

and XY continued to negotiate.  (*Id.* at 10 ¶ 16.)  Ultimately, the negotiations concluded

with the parties executing a Patent Assignment and License Agreement (the

"Agreement") on January 23, 2017.  (*Id.* at 10 ¶ 17.)

**C.    Reissue Proceedings**

After the Agreement was finalized, Beckman filed a reissue application for the

'220 Patent seeking to add Evans as an inventor.  (*Id.* at 10 ¶ 18.)  The reissue

application was filed less than a month after the Agreement was executed, on February

21, 2017, and less than two years after the '220 Patent originally issued.  (*Id.* at 10 ¶

19.)  Along with the reissue application, Wong filed a Patent Office form entitled

"Reissue Application Declaration by the Assignee."  (*Id.* at 11 ¶ 20.)

It is undisputed that reissue is a proper vehicle for correcting inventorship, at

least where the issued patent reflects an inventorship error.  (*Id.* at 11 ¶ 21; ECF No.

613-1 at 5 ¶ 21.)  It is further undisputed that Wong used the correct Patent Office

Reissue Application Declaration Form for a reissue declaration.  (ECF No. 599 at 11 ¶

22; ECF No. 613-1 at 5 ¶ 22.)  The parties dispute, however, whether the inventorship

defect here "was properly characterized as an 'error' in the Reissue Declaration."  (ECF

No. 613-1 at 5 ¶ 22.)

In any case, during prosecution of the reissue application for the '220 Patent, the

Examiner conducted prior art searches in view of the addition of Evans as a named

inventor, and the Patent Office subsequently reissued the '220 Patent with identical

claims as U.S. Patent No. RE46,559 ("the '559 Patent").  (ECF No. 599 at 11 ¶ 24.)

**D.    Prior Art Versions of the Summit Software**

The '559 Patent specification provides that

[o]ne method of gaining spatially separated data may be to

> use compensation algorithms as those skilled in the art could
> appreciate.  Rotation of the data (forward scatter vs. side
> scatter) may be a more accurate mechanism to do this.
>
> . . .
>
> Rather than design new hardware, it may be desirable to
> implement this in a DSP perhaps by a rotation algorithm.
> This may include an ability to do compensation on data
> when rotating it.  In addition to rotation, a user can specify a
> region to zoom in on.

(ECF No. 74-8 (559 Pat.) at 7:17–20, 7:49–52.)  The '559 Patent specification also

incorporates by reference patent application No. WO01/28700 ("Ellison").  (ECF No. 599

at 11 ¶ 26.)  Ellison was submitted to the Patent Office by the applicant in an

Information Disclosure Statement ("IDS").  (*Id.* at 12 ¶ 27.)  The Examiner expressly

indicated that he considered the Ellison reference during prosecution of the '870

Application.  (*Id.* at 12 ¶ 29.)

The parties dispute whether, in this way, "[t]he '559 Patent specification and file

history discloses that 'compensation' was a known feature in flow cytometry."  (ECF No.

599 at 11 ¶ 25.)  Plaintiffs assert that Ellison extensively discusses the compensation

feature in Summit software and expressly indicates that compensation could be

executed using Summit software.  (*Id.* at 12 ¶ 28.)  TOG admits that Ellison "mentions"

the compensation feature in Summit software but denies "that Ellison discusses

compensation or Summit 'extensively.'"  (ECF No. 613-1 at 6 ¶ 28.)  Rather, according

to TOG, "Summit is mentioned once, and the transformations performed by the

compensations feature are not discussed."  (*Id.*)

## II. LEGAL STANDARDS

### A.    Rule 56(a)

"Summary judgment is appropriate where 'the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law.'" *Scott v. Nationwide Agribusiness Ins. Co.,* 141 F.4th 1151, 1153 (10th

Cir. 2025) (quoting Fed. R. Civ. P. 56(a)).  "A fact is 'material' if, under the governing

law, it could influence the outcome of the lawsuit." *Mauldin v. Driscoll,* 136 F.4th 984,

993 (10th Cir. 2025) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

"A dispute over a material fact is 'genuine' if a rational [factfinder] could find in favor of

the nonmovant on the evidence presented." *Id.*  Courts "view the evidence and the

reasonable inferences to be drawn from the evidence in the light most favorable to the

nonmoving party." *Cronick v. Pryor,* 99 F.4th 1262, 1267 (10th Cir. 2024) (internal

quotation marks omitted).

**B.      Inequitable Conduct**

"Inequitable conduct is an equitable defense to patent infringement that, if

proved, bars enforcement of a patent." *Therasense, Inc. v. Becton, Dickinson & Co.,*

649 F.3d 1276, 1285 (Fed. Cir. 2011).  "It is only applied where the patentee has

unfairly obtained an unwarranted patent through misconduct." *Ohio Willow Wood Co v.

Alps South, LLC,* 735 F.3d 1333, 1344 (Fed. Cir. 2013).

"To prove inequitable conduct, the challenger must show by clear and convincing

evidence that the patent applicant (1) misrepresented or omitted information material to

patentability, and (2) did so with specific intent to mislead or deceive the PTO." *In re

Rosuvastatin Calcium Pat. Litig.,* 703 F.3d 511, 519 (Fed. Cir. 2012); *see also Health

Grades, Inc. v. MDX Medical, Inc.,* 51 F. Supp. 3d 1069, 1079 (D. Colo. 2014) ("The

party challenging the enforceability of a patent must prove materiality and intent by clear

and convincing evidence." (citing *Molins PLC v. Textron, Inc.,* 1172, 1178 (Fed. Cir.

1995)).  Importantly, "[i]ntent and materiality are separate requirements." *Therasense,*

649 F.3d at 1290.  Thus, "[a] district court should not use a 'sliding scale,' where a weak showing of intent may be found sufficient based on a strong showing of materiality, and vice versa," nor should it "infer intent solely from materiality."  *Id.*  Rather, "a court must weigh the evidence of intent to deceive independent of its analysis of materiality."  *Id.*

"[A]s a general matter, the materiality required to establish inequitable conduct is but-for materiality," meaning "the misrepresentation was . . . the but-for cause of the patent's issuance."  *Therasense,* 649 F.3d at 1291; *see also Ohio Willow Wood*, 735 F.3d at 1345 ("[A]n allegation of inequitable conduct before the PTO requires proof that the patentee withheld or misrepresented information that, in the absence of the withholding or misrepresentation, would have prevented a patent claim from issuing.").[3]

As for specific intent, "[i]n a case involving nondisclosure of information, clear and convincing evidence must show that the applicant *made a deliberate decision* to withhold [] *known* material [information]."  *Therasense,* 649 F.3d at 1290 (quoting *Molins,* 48 F.3d at 1181) (emphases added in original).  "In other words, the accused infringer must prove by clear and convincing evidence that the applicant knew of the [information], knew that it was material, and made a deliberate decision to withhold it."  *Therasense,* 649 F.3d at 1290.  "A finding that the misrepresentation or omission amounts to gross negligence or negligence under a 'should have known' standard does not satisfy this intent requirement."  *Id.*

"Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence.  However, to meet the clear and

---

[3] The Federal Circuit has recognized a limited exception "to the general rule requiring but-for proof" "in cases of affirmative egregious misconduct."  *Id.*  However, TOG does not argue any affirmative egregious misconduct took place here.  (*See generally* ECF No. 613-1.)

convincing evidence standard, the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.'" *Id.* (quoting *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.,* 537 F.3d 1357, 1366 (Fed Cir. 2008)).  "Indeed, the evidence 'must be sufficient to *require* a finding of deceitful intent in the light of all the circumstances.'" *Therasense,* 649 F.3d at 1290 (quoting *Kingsdown Medical Consultants, Ltd. v. Hollister Inc.,* 863 F.2d 867, 873 (Fed. Cir. 1988)) (emphasis added in original).  "Hence, when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found."  *Therasense,* 649 F.3d at 1290–91 (citing *Scanner Techs. Corp. v. ICOS Vision Sys. Corp.,* 528 F.3d 1365, 1376 (Fed. Cir. 2008) ("Whenever evidence proffered to show materiality or intent is susceptible of multiple reasonable inferences, a district court clearly errs in overlooking one inference in favor of another equally reasonable inference.")).

"Because the party alleging inequitable conduct bears the burden of proof, the 'patentee need not offer any good faith explanation unless the accused infringer first . . . prove[s] a threshold level of intent to deceive by clear and convincing evidence.'" *Therasense,* 649 F.3d at 1291 (quoting *Star,* 537 F.3d at 1368).  "The absence of a good faith explanation for withholding a material reference does not, by itself, prove intent to deceive."  *Therasense,* 549 F.3d at 1291.

### III. ANALYSIS

Plaintiffs seek summary judgment as to TOG's 19th affirmative defense and 21st counterclaim that the '559 Patent is unenforceable under the doctrine of inequitable conduct.  (ECF No. 535 at 17; *id.* at 67–68 ¶¶ 155–60.)[4]  Specifically, TOG alleges that

---

[4] *See generally Agfa Corp. v. Creo Prods. Inc.,* 451 F.3d 1366, 1371 (Fed. Cir. 2006)

Beckman engaged in inequitable conduct during the prosecution of the '559 Patent by making certain misrepresentations and/or omissions regarding (1) Evans's status as an inventor and (2) prior art versions of the Summit software.  (*Id*.)  The parties generally refer to these two theories of TOG's inequitable conduct claim as the "Inventorship-Based Theory" and the "Summit-Based Theory," respectively.  (*See generally* ECF Nos. 599, 613-1, 623.)

## A.    Inventorship-Based Theory

TOG's Inventorship-Based Theory itself consists of three alleged acts—namely, that Beckman acted inequitably by (1) omitting Evans as a proper inventor from the '870 Application as an initial matter, (2) "failing to correct inventorship" before the '220 Patent's issuance, and (3) later "misrepresenting that failure [to correct inventorship] as an 'error' rather than as a deliberate act" during the reissue proceedings.  (ECF No. 535 at 68–69 ¶¶ 158–60.)  The Court addresses each in turn.

### 1.    Evans's Initial Omission from '870 Application

TOG's inequitable conduct counterclaim first alleges that

> Beckman, by and through its patent counsel, . . . *filed* and continue[d] to prosecute the '870 application . . . until issuance despite acknowledging the omission of a proper inventor years before the patent issued.  This omission . . . was done with an intent to deceive the PTO.

(ECF No. 535 at 68 ¶ 158 (emphasis added).)

Plaintiffs contend they "are entitled to summary judgment that the record does not support a finding of any inventorship-based inequitable conduct occurring at the time the '870 Application was filed."  (ECF No. 599 at 16–17.)  That indeed appears to

---

(recognizing that inequitable conduct may be raised as either a defense or counterclaim).

be the case, as TOG admits that its "expert on inequitable conduct [has] not identif[ied] any inequitable conduct related to inventorship in connection with the filing of the original patent application," or otherwise "before 'the 2012 time period.'"  (ECF No. 599 at 8 ¶¶ 5–6; ECF No. 613-1 at 2 ¶¶ 5–6 (admitting).)

However, in apparent recognition of this lack of evidence, TOG states in its response that it "is not alleging that Beckman committed inequitable conduct by filing the 870 application without naming Mr. Evans as an inventor" and as such "any arguments by XY on this issue are moot."  (ECF No. 613-1 at 11.)  The Court will hold TOG to this representation at trial and, as a consequence, it finds it unnecessary to grant summary judgment to Plaintiffs on a claim TOG expressly represents it is not pursuing.

Accordingly, to the extent Plaintiffs seek summary judgment of no inequitable conduct arising from the initial failure to name Evans as an inventor in the '870 Application, the Motion is denied as moot.

2.    Failure to Correct Inventorship Before Issuance

TOG's second assertion of inequitable conduct related to inventorship derives largely from the same allegation in its counterclaim.  Specifically, TOG alleges that

> Beckman, by and through its patent counsel . . . , filed and *continue[d] to prosecute* the '870 application . . . until issuance despite acknowledging the omission of a proper inventor years before the patent issued.  This omission, *and Beckman's delay in correcting it*, was done with an intent to deceive the PTO.

(ECF No. 535 at 68 ¶ 158 (emphases added).)  TOG further alleges that, "[b]ut for Beckman's, XY's,[5] and their counsel's collective failures to properly and timely disclose

---

[5] TOG's response addresses only *Beckman's* failure to correct inventorship.  (*See* ECF

the inventive omissions, the underlying '870 application . . . would not have been issued

by the PTO."  (*Id.* at 68–69 ¶ 160.)

Plaintiffs contend they are entitled to summary judgment on TOG's claim that

Beckman engaged in inequitable conduct by waiting to correct inventorship until after

the '220 Patent had issued because TOG "cannot meet the high burden of proving that

Mr. Wong had the requisite intent to deceive the Patent Office, or that correcting

inventorship after issuance, which is specifically allowed in Patent Office procedures,

was material to patentability."  (ECF No. 599 at 15.)

Contrary to Plaintiffs' assertion, materiality is very likely satisfied here, as the

Federal Circuit has long held that, "[a]s a critical requirement for obtaining a patent,

inventorship is material."  *PerSeptive Biosys., Inc. v. Pharmacia Biotech, Inc.,* 225 F.3d

1315, 1321 (Fed. Cir. 2010).  Even so, the Court agrees with Plaintiffs that TOG's claim

fails because it has not "mustered sufficient evidence" upon which "a factfinder could

reasonably conclude that deceptive intent is the single most reasonable inference."

*Sysmex Corp. v. Beckman Coulter, Inc.,* 2022 WL 1503987, at *4 (D. Del. May 6, 2022);

*see also Ohio Willow Wood,* 813 F.3d at 1357 (explaining that a party alleging

inequitable conduct must prove materiality *and* intent).

The Court reiterates that, to establish specific intent to deceive the PTO, "the

accused infringer must prove by clear and convincing evidence that the applicant knew

of the [information], knew that it was material, and made a deliberate decision to

---

No. 613-1 at 10–15; *see also* ECF No. 637 at 23 ("counsel for Beckman, including Charles
Wong, exhibited a pattern of behavior characterized by a lack of candor with respect to the
inventorship of the '220 and '559 patents")  The Court thus presumes that TOG is no longer
alleging that *XY* engaged in inequitable conduct by "fail[ing] to properly and timely disclose the
inventive omissions."  (ECF No. 535 at 68–69 ¶ 160.)

withhold it." *Therasense,* 649 F.3d at 1290. To be sure, here, there can be little debate

that (1) Beckman *knew* Evans should be added as an inventor as of at least roughly

2013, after Beckman had concluded its investigation of Evans's inventorship, (*e.g.,* ECF

No. 599 at 8 ¶ 8; *see also* ECF No. 599-1 (Wong Dep.) at 19:20–22:23 (testifying that,

to his recollection, the investigation into Evans's inventorship took "[d]efinitely more than

a year")), and (2) that Beckman made a deliberate decision *not* to correct inventorship

until the Agreement with XY had been finalized, (*e.g.,* ECF No. 599 at 9 ¶ 11).

Nevertheless, knowledge and an intent *to withhold* are alone insufficient to

establish deceitful intent. *See McKesson,* 487 F.3d at 913 ("mere intent to withhold

does not support an inference of intent to deceive"); *see also Health Grades,* 51 F.

Supp. 3d at 1080 ("It is not the case that intent to deceive is the necessary motivation

for any nondisclosure."). Rather, "the intent in question is an intent to deceive the

patent office into issuing the patent, not merely the intent to do what was done in

prosecution." *3M Innovative Properties Co. v. Dupont Dow Elastomers LLC,* 361 F.

Supp. 2d 958, 977 (D. Minn. 2005) (citing *Therma-Tru Corp. v. Peachtree Doors, Inc.,*

44 F.3d 988, 995 (Fed. Cir. 1995)).

Here, Plaintiffs submit that it was never Beckman's intent to deceive the PTO into

issuing a patent with invalid inventorship information. To the contrary, they assert the

evidence supports that "Wong always intended to correct inventorship, and it simply

took time for XY and Beckman to work out the details of their relationship before that

could be accomplished." (ECF No. 599 at 18.) Even setting aside Wong's testimony as

to his stated intent, the Court agrees that the evidence concerning his course of conduct

during the relevant period is wholly inconsistent with an intent to deceive the PTO into

issuing an unwarranted patent.  In particular, it makes little sense that Wong (and others at Beckman) would have invested years of time and resources tracking down individuals who could corroborate Evans's inventive contributions, and negotiating an Agreement setting forth the parties' rights and obligations in the patent that may ultimately issue, if it were Beckman's intent all along to deceive the PTO into issuing a patent with inventorship information that it knew to be inaccurate.

Still, TOG's most compelling counterargument is that "Beckman . . . intentionally conceal[ed] Mr. Evans' inventorship . . . for years . . . for the sole purpose of maintaining leverage during negotiations with XY over the parties' respective rights to, and ownership of, the '559 Patent . . . ."  (ECF No. 613-1 at 11.)  This appears to be in reference to the fact that the "final agreement . . . included having Mr. Evans assign his rights to *Beckman*."  (*Id.* at 22 (emphasis in original).)  Ultimately, however, the Court is not convinced that the cited e-mail communications between the two companies' in-house counsel support an inference of anything more than arms-length negotiations between two sophisticated business entities with substantial experience crafting license agreements like the one that resulted here.  (*See generally* ECF No. 613-5.)  As a practical matter, if it were Beckman's intent to coerce XY (via Evans) to turn over its rights in the patent by refusing to correct inventorship unless and until XY did so, that tactic appears to have been ineffective, as it took over two years from the time that Wong proposed that term for the Agreement for the parties to work out the remaining particulars.  (*See id.* at 10 (where Wong proposed to XY's in-house counsel on August 29, 2014 that "Evans will assign rights to BCI," among other terms).)

As a final point, the Court reiterates that, even had Plaintiffs provided no

explanation whatsoever for the delay in correcting in inventorship, "[t]he absence of a good faith explanation for withholding a material reference does not, by itself, prove intent to deceive." *Therasense,* 649 F.3d at 1291.  Rather, "[b]ecause the party alleging inequitable conduct bears the burden of proof, the 'patentee need not offer any good faith explanation unless the accused infringer first . . . prove[s] a threshold level of intent to deceive by clear and convincing evidence.'"  *Id.* (quoting *Star,* 537 F.3d at 1368). Despite this, TOG's response appears almost wholly dedicated to arguing why Plaintiffs' cited evidence is insufficient to demonstrate "a *lack* of deceptive intent."  (*See, e.g.,* ECF No. 613-1 at 18 (emphasis added).)  But apart from the undisputed fact that Beckman had knowledge of the inventorship issue for four to five years before it was, at last, corrected, it remains unclear to the Court what further evidence-——even if indirect or circumstantial—TOG believes supports that Beckman *did* have a specific intent to deceive the PTO.  Even setting aside the explanation Plaintiffs have offered for the delay, TOG's failure to marshal affirmative evidence of Beckman's specific intent to deceive the PTO is independent grounds to warrant summary judgment in Plaintiffs' favor on this theory of inequitable conduct.

At bottom, the Court does not mean to condone the lengthy delay in informing the PTO of material information regarding inventorship that undisputedly occurred here. But the specific, atypical fact pattern before it simply does not, in this Court's view, entail the sort of unjust behavior the doctrine of inequitable conduct was intended to redress.

Accordingly, the Motion is granted to the extent it seeks summary judgment on TOG's claim that Beckman acted inequitably by failing to correct inventorship until the Agreement was finalized.  *See Ferring B.V. v. Barr Labs., Inc.,* 437 F.3d 1181, 1186–87

(Fed. Cir. 2006) ("While our precedent urges caution in the grant of summary judgment respecting a defense of inequitable conduct, summary judgment is not foreclosed.").

      3.    <u>Reissue Application</u>

      Lastly, regarding inventorship, TOG alleges that, after Beckman and XY at last finalized the Agreement,

> Beckman . . . filed a re-issue application that falsely certified that the omission of the inventor [w]as an "error" within the meaning of the patent laws, where such omission was a deliberate act of concealment with an intent to deceive the PTO during the pendency of the '870 application. Neither Beckman, nor XY, nor their counsel, acknowledged to the PTO that it knew of the omission in inventorship at least as early as 2021,[6] further adding to their withholding of material information.

(*Id.* at 68 ¶ 159.)  Plaintiffs move for summary judgment on this allegation, too, because Wong's indication that there was an "error" in inventorship in the reissue application was not a misrepresentation or omission as a matter of law.  (ECF No. 599 at 23.)  The Court agrees.

      The Federal Circuit recently interpreted the meaning of "error," as that term is used in § 256 of the Patent Act—the statutory provision governing the "[c]orrection of named inventor[s]." *Egenera, Inc. v. Cisco Sys., Inc.,* 972 F.3d 1367, 1376 (Fed. Cir. 2020); 35 U.S.C. § 256.[7]  The Circuit first observed that its "precedent provides that

---

[6] The Court presumes that TOG intended to allege that Beckman and XY "knew of the omission in inventorship at least as early as 20*12*."  Moreover, here again, as TOG's response only addresses conduct attributable to *Beckman,* the Court presumes TOG is no longer alleging that *XY* engaged in inequitable conduct during the reissue proceedings.  *See infra* n.5.

[7] Notably, reissue applications, like the one filed by Beckman here, are governed by § 251 of the Patent Act.  *See* 35 U.S.C. § 251.  Although it does not appear the Federal Circuit has had an occasion to interpret the meaning of "error" as it is used in § 251 since the Leahy-Smith America Invents Act ("AIA") was enacted, the Court is persuaded the Federal Circuit would ascribe it a similar meaning.  *See Egenera,* 972 F.3d at n.3 ("Reissue under 35 U.S.C. §

'error' in § 256 includes 'all varieties of mistakes—honest and dishonest'—rather than
only unintentional accuracy."  *Id.* (quoting *Stark v. Adv. Magnetics, Inc.,* 119 F.3d 1551,
1554–56 (Fed. Cir. 1997)).  Specifically, "*Stark* expressly construed 'error' to 'embrace
more than simply honest mistakes.'"  *Egenera,* 972 F.3d at 1376–77 (quoting *Stark,* 119
F.3d at 1554.)  The Federal Circuit went on to affirm that the amendments imposed by
the Leahy-Smith America Invents Act ("AIA")—namely, the deletion of the language in
§ 256 requiring that the "error" occurred "without . . . deceptive intention"—"did not
narrow the meaning of 'error.'"  *Egenera,* 972 F.3d at 1377.  Rather, post-AIA, "§ 256
does not exclude 'considered acts,' or even 'deceptive intention,' from the meaning of
'error.' [] 'Error' is simply the incorrect listing of inventors."  *Id.* (citation omitted).

Based on the Federal Circuit's interpretation of the meaning of an inventorship
"error" in *Egenera,* the Court cannot conclude that, in checking the box identifying an
inventorship error on the applicable reissue declaration form, Wong made *any*
representation to the PTO about *how* the incorrect listing of inventors on the '220 Patent
came to be.  Notably, even TOG's expert seems to agree on that point.  True, he
originally "opined that Beckman, including Mr. Wong, committed inequitable conduct by
filing U.S. Application No. 15/438,423 ('the 423 reissue application'), which issued as
U.S. Patent RE46,559 ('the 559 Patent'), intentionally misrepresenting that the failure to
name Mr. Evans as an inventor was an 'error.'"  (ECF No. 613-1 at 5 ¶ 23 (citing ECF
No. 599-6 at ¶¶ 137, 169, 187–195).)  However, he reneged on that opinion at
deposition:

> Q: And am I correct in characterizing your opinion that Mr.
> Wong describing the error as he did here amounted to

251 also requires 'error,' and our case law there is consistent with our case law on § 256.").

inequitable conduct?

[Objection from counsel.]

A: Filling out this form, no, it's not inequitable conduct.

Q: Is it your opinion that Mr. Wong's description of the error
as he has described it here in this top box on page 2
amounts to inequitable conduct?

[Objection from counsel.]

A: No.

(ECF No. 599-3 (Tumey Dep.) 130:2–131:21.)

Still, TOG argues that Plaintiffs "conflate[] two separate issues: the requirements

for correcting inventorship and the standard for inequitable conduct."  (ECF No. 613-1 at

15–16.)  And TOG is quite right in observing that, "while correction of inventorship and

inequitable conduct are related, they are not coextensive and involve separate inquiries

governed by two different standards (one statutory and one equitable)."  (*Id.* at 16.)  In

*Egenera,* for instance, the Federal Circuit described "§ 256 as a savings provision,

functioning to prevent invalidation when correction is available," while "the inequitable-

conduct rules . . . provide a safety valve in the event of deceit."  972 F.3d at 1377.

But this does not change the Court's conclusion that Wong made no

representations to the PTO about how the "error" in inventorship occurred by checking

the applicable box on the reissue application declaration form.  *Cyber Acoustics, LLC v.*

*Belkin International, Inc.,* upon which TOG relies, illustrates the Court's point.  988 F.

Supp. 2d 1236 (D. Or. 2013).

There, the district court proceeded to consider whether the accused infringer

sufficiently alleged inequitable conduct where the patentee's employee had falsely

represented to the PTO in the original patent application that "he was the sole inventor"

of the claimed invention—notwithstanding that inventorship was later corrected via "[t]he streamlined process under the [AIA]." *Id.* at 1244. The court reasoned that, although the patentee had "availed itself of 35 U.S.C. § 256(a) and petitioned the PTO directly for a Certificate of Correction," the AIA's "changes do not restrict judicial relief based on inequitable conduct." *Id.* In other words, the Court reads *Cyber Acoustics* to stand for the proposition that a misrepresentation amounting to inequitable conduct is not excused merely because the patentee later corrected the misrepresentation via the AIA's procedures. That is distinct from what TOG is asserting here, which is that Wong's indication there was an "error" in inventorship in the eventual reissue application itself amounted to inequitable conduct.[8]

Thus, even had the Court found that genuine issues of fact precluded summary judgment as to whether Beckman (via Wong) acted with deceptive intent in failing to correct inventorship before the '220 Patent issued (which it did not), Wong's indication there was an "error" in inventorship on the reissue application declaration form could not have been a material misrepresentation as a matter of law. Accordingly, the Motion is granted to the extent TOG asserts inequitable conduct based on representations that Wong made in the reissue application declaration form.

**B.    Summit-Based Theory**

Finally, TOG's "Summit-Based Theory" alleges that,

---

[8] True, it appears the accused infringer in *Cyber Acoustics* also alleged that the patentee engaged in inequitable conduct by representing there was an inventorship "error" in its (pre-AIA) § 256 petition for a certificate of correction. *Id.* at 1243. Tellingly, however, the district court did not even mention this allegation in ultimately concluding that the accused infringer had pled a claim for inequitable conduct with sufficient particularity to survive Rule 12. *Id.* at 1244–45 (identifying the "what" of the accused infringer's inequitable conduct claim as its allegation that the patentee's employee falsely "declared himself to be the 'original, first, and sole inventor' of the subject matter claimed in the [patent]").

> [i]n connection with the prosecution of the '559 patent, . . .
> XY, ST, and/or Beckman Coulter, by and through their
> patent counsel [], . . . failed to disclose the highly material
> Summit and CyTrack software, whose rotational, scaling,
> and/or translational data transformation features the
> Plaintiffs admit are embodiments of the '559 patent's claims.
> Summit and CyTrack were individually or collectively in use
> by the public (and/or sold or offered for sale by Beckman or
> its predecessor(s)) at least 1 year prior to the earliest priority
> patent application.

(ECF No. 535 at ¶ 156.)[9]

To provide further context, TOG's assertion that prior art versions of Summit

"performed the data rotation, tracking, and zooming functions claimed in the '559

Patent" derives from the opinion of its technical expert, Dr. Robinson, that the data

rotation function claimed in the '559 Patent "is *indistinguishable* from that . . . XY had

been performing on particle data using the pre-2002 Summit compensation algorithm."

(ECF No. 613-1 at 23; ECF No. 602-14 at 103 n.35.)  In turn, TOG's expert on

inequitable conduct opines, based on his "understand[ing] from Dr. Robinson," "(1) that

pre-2002 versions of Summit included a compensation feature; and (2) that the

compensation feature in the pre-2002 version of Summit included the claimed data

rotation feature by virtue of their compensation algorithm."  (ECF No. 599-6 at ¶ 150.)

Plaintiffs dispute that the Summit software's compensation functionality

performed the data rotation claimed by the '559 Patent.  (ECF No. 623 at 14.)

Nevertheless, they argue that, "even if Dr. Robinson's theory that 'compensation' is the

---

[9] Once more, the Court understands that TOG now alleges only that this failure was attributable to "counsel for Beckman's predecessor in interest, DakoCytomation, including Nicole Ressue and Luke Santangelo"—not XY or ST.  (ECF No. 638 at 24; *see also* ECF No. 613-1 at 23 ("TOG has alleged that Ms. Ressue and Mr. Santangelo committed inequitable conduct by failing to disclose material information regarding prior art versions of Summit software that performed the data rotation, tracking, and zooming functions claimed in the '559 Patent.").)

same [] thing as the claimed 'rotation' were correct," TOG's Summit-Based Theory fails

as a matter of law because, among other reasons, "the Summit software 'compensation'

feature that Trans Ova . . . alleges was withheld from the Patent Office was, in fact,

expressly disclosed by the applicants and considered by the Examiner during

prosecution."  (ECF No. 599 at 26.)  In particular, Plaintiffs assert the compensation

feature was "discussed extensively in the context of its application in Summit software in

patent publications incorporated by reference into the '559 Patent specification

(WO01/28700 or 'Ellison')."  (*Id.* at 27.)  Thus, Plaintiffs contend "disclosure of the prior

art versions of Summit would have been cumulative of Ellison with respect to the

'compensation' feature."  (*Id.* at 29.)

　　　　Ultimately, the Court agrees that summary judgment is warranted, as TOG has

failed to rebut Plaintiffs' contention that the allegedly undisclosed Summit software

would have been merely cumulative of Ellison.  *See Tegal Corp. v. Tokyo Am., Inc.,* 257

F.3d 1331, 1349 (Fed. Cir. 2001) (where accused infringer failed to meets its burden on

materiality because "it failed to overcome the evidence that the [allegedly undisclosed

reference was] cumulative art").

　　　　Where an applicant "fails to disclose prior art to the PTO, that prior art is but-for

material if the PTO would not have allowed a claim had it been aware of the

undisclosed prior art."  *Therasense,* 649 F.3d at 1291*; see also Cal. Institute of Tech. v.*

*Broadcom Ltd.,* 25 F.4th 976, 991 (Fed. Cir. 2022) ("Prior art is but-for material if the

PTO would have denied a claim had it known of the undisclosed prior art.").  Decidedly,

however, "a prior art reference that is otherwise material 'is not but-for material if it is

merely cumulative.'"  *Luv n' Care, Ltd. v. Laurain,* 98 F.4th 1081, 1098 (Fed. Cir. 2024)

(quoting *Cal Inst. of Tech.,* 25 F.4th at 991) (affirming district court's grant of summary judgment based on finding that undisclosed prior art was "merely cumulative" of prior art "references the PTAB considered in IPR proceedings")). "A reference is cumulative when it teaches no more than what a reasonable examiner would consider to be taught by the prior art already before the PTO." *Regeneron Pharmaceuticals, Inc. v. Merus N.V.,* 864 F.3d 1343, 1350 (Fed. Cir. 2017) (internal quotation marks omitted).

As noted above, TOG does not even attempt to grapple in its response with Plaintiffs' contention that the allegedly undisclosed prior art versions of the Summit software are cumulative of Ellison with respect to compensation. (*See* ECF No. 613-1 at 23–24.) To the contrary, it acknowledges "it is true that Ellison discusses compensation (which inherently rotates particle data) . . . " (*Id.*)

Instead, TOG merely insists that the prior art versions of the Summit software should have been independently disclosed in an IDS, and that the incorporation of Ellison among "*hundreds* of [other] references" was insufficient to render the applicant's alleged "concealment of the prior art Summit software immaterial." (*Id.* at 24 (emphasis added).) But TOG's arguments in this regard are belied by the fact it is undisputed "[t]he Examiner expressly indicated that he considered the Ellison reference during prosecution of the '870 Application." (ECF No. 599 at 12 ¶ 29; ECF No. 613-1 at 6 ¶ 29.)

In sum, TOG's failure to rebut Plaintiffs' assertion that the prior art versions of the Summit software are merely cumulative of the disclosed Ellison reference is fatal to its Summit-Based Theory. Put differently, at least for the purposes of its inequitable conduct claim, TOG has failed to persuade the Court there is sufficient evidence upon

which a factfinder could reasonably conclude the failure to disclose prior art versions of Summit was but-for material to patentability.

Accordingly, the Motion is granted to the extent it seeks summary judgment of no inequitable conduct based on the applicants' alleged failure to disclose prior art versions of the Summit software.

## IV. CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Summary Judgment of No Inequitable Conduct (ECF Nos. 598, 599) is GRANTED IN PART and DENIED IN PART.  Specifically, the Court ORDERS that:

1.     The Motion is DENIED AS MOOT to the extent it seeks summary judgment of no inequitable conduct based on any purported inequitable conduct taking place at the time the '870 Application was initially filed;

2.     The Motion is GRANTED in all other respects;

3.     Defendant shall be precluded at trial from relying on its 19th affirmative defense of inequitable conduct (ECF No. 535 at 17) as a defense to Plaintiffs' claim for infringement of the '559 Patent; and

4.     Defendant's 21st affirmative counterclaim of inequitable conduct regarding the '559 Patent (*id.* at 67–69 ¶¶ 155–160) is DISMISSED with prejudice as to all Plaintiffs.

Dated this 4th day of September, 2025.

BY THE COURT:

William J. Martinez
Senior United States District Judge